# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ANTONIO McAFEE,

                           Petitioner,

                                                     **Case No. 06-C-1200**

        **v.**

PHIL KINGSTON,
Warden, Waupun Correctional Institution,

                           Respondent.

---

## DECISION AND ORDER

---

      On November 17, 2006, the petitioner, Antonio McAfee ("McAfee"), who is currently incarcerated at the Waupun Correctional Institution, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. McAfee challenges his January 20, 1997, conviction by the circuit court of Milwaukee County, Wisconsin, for first-degree intentional homicide, while armed with a dangerous weapon, in violation of Wis. Stat. §§ 940.01(1) and 939.63. Pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, the Court conducted a review of McAfee's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On November 28, 2006, this Court issued a Decision and Order determining that McAfee's petition set forth cognizable constitutional claims and was satisfied that McAfee had exhausted available state remedies. McAfee requested an additional period of time within which to investigate further and amend the petition. The Court allowed McAfee to file an amended petition. McAfee did not file an amended petition.

On February 5, 2007, this Court issued a Decision and Order requesting that the Respondent answer the petition. On February 28, 2007, the Respondent filed its Answer.

## FACTUAL AND PROCEDURAL BACKGROUND

McAfee was charged with one count of first-degree intentional homicide while armed. The testimony in McAfee's jury trial began on January 15, 1997. The jury returned a guilty verdict on January 20, 1997. On February 25, 1997, Circuit Court Judge Stanley A. Miller sentenced McAfee to a term of life imprisonment without the possibility of parole. (Answer to Petition for Writ of Habeas Corpus ("Answer"), Ex. A.)

The underlying facts are set forth in the court of appeals decision.[1]

> On September 17, 1996, at approximately 8:25 p.m., Milwaukee Police Officers Wendolynn Tanner and Brian Ketterhagen attempted to detain McAfee in an alley just north of 2100 West Hampton Avenue and just east of North 21st Street in the City of Milwaukee, to investigate possible drug activity. McAfee fled north and Office Tanner gave chase on foot. McAfee's route was as follows. He ran three or four houses north in the alley and then turned left through a yard onto North 21st Street. He ran north past two houses and then west through a yard located at 4841 North 21st Street. Office Ketterhagen remained in the squad car.

> Immediately after Officer Tanner began his chase, Officer Ketterhagen reversed his squad car south out of the alley onto West Hampton Avenue and drove west. As Officer Ketterhagen reached North 21st Street, he observed the suspect run west across North 21st Street, followed by Office Tanner. In an effort to keep up with the chase, Officer Ketterhagen

---

[1]"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Case 2:06-cv-01200-RTR   Filed 11/03/08   Page 2 of 29   Document 7

pulled into a west and northbound alley of the 21st Street block. The alley did not go all the way through the block to the north, but dead-ended at a split-rail fence running east to west, somewhat south of the 4841 North 21st Street location. As Officer Ketterhagen was driving north in the alley with the squad's lights on, he observed the suspect come through an opening in a stockade fence located on the east side of the alley at the 4841 North 21st Street address north of the split-rail fence. Officer Ketterhagen, while seated in his squad, noticed the suspect "kinda [hide] himself around the corner . . . to the south of the gap in the stockade fence." He saw the suspect extend his arm and fire numerous shots at Officer Tanner as he came through the opening in the fence. Officer Tanner fell backwards to the ground. Officer Ketterhagen exited the squad car and began to fire at McAfee. McAfee ran north in the grassy area north of the fence. Officer Ketterhagen continued to shoot at McAfee until he lost sight of him. He then returned to his fallen partner and radioed to dispatch, "officer down."

Officer Ketterhagen did not know if any of the bullets he fired hit McAfee, but investigators soon discovered a trail of blood which led them to 4952 North 22nd Street, the home of McAfee's aunt. Police found McAfee hiding in a closet inside the home with the .357 revolver used to shoot Tanner.

According to the Milwaukee County Medical Examiner, Officer Tanner suffered three gunshot wounds in the shootout and was pronounced dead shortly after the incident. The fatal shot passed under his right armpit, through his heart and lungs, and out the left side of his body, severing his aorta. The source of the bullet that caused the heart wound was not identified. Another "potentially fatal" shot severed Officer Tanner's spinal cord, ricocheted through his chest cavity, and lodged a bullet near his right clavicle. The bullet recovered from Officer Tanner's body from this shot was linked to McAfee's gun. The third shot passed through Officer Tanner's left arm and was deemed to be a flesh wound, not fatal in nature.

(Answer, Ex. B at 2-4.)

The defense theory was that McAfee did not intend to kill Police Officer Wendolynn Tanner ("Tanner"), but merely fired backwards through the bushes without aiming as he ran, in order to slow down the pursuit. Trial counsel also used a "friendly fire, cover- up" strategy. (Answer, Ex. 111 *Machner* hearing" at 6, 22.) The defense argued that the fatal shot actually could have been fired by Police Officer Brian Ketterhagen ("Ketterhagen"), based on angles calculated using the position of Tanner's body, the recovered shell casings and damage caused to a nearby fence during the shootout.

McAfee provided two statements to police officers wherein he admitted he fired in the direction of Tanner during the chase to deter Tanner from continuing the pursuit. McAfee never admitted that he actually shot Tanner. The bullet from the fatal shot was never recovered but the bullet from the "potentially fatal" shot, which entered Tanner's back and lodged in his clavicle, was recovered and found to be from McAfee's .357 revolver. (Answer, Ex. B at 8.) At the trial, Ketterhagen testified that he saw McAfee stop running, hide around a corner and ambush Tanner face-to-face as he came through the opening in the fence. Ketterhagen also said that Tanner was already down before Ketterhagen got out of his vehicle and began firing at McAfee. The parties stipulated to the submission of first-degree reckless homicide, but the jury rejected the lesser included offense and found McAfee guilty of first-degree intentional homicide. (Answer, Ex. G.)

After McAfee was sentenced, he requested that the circuit court allow post-conviction discovery concerning chemical identification of the metal trace alloys of the bullet recovered from Tanner's body to be compared to microscopic evidence from Tanner's shirt, the tissue

-4-

from the aorta wound track, and the fence. McAfee sought this evidence to determine whether he or Ketterhagen fired the bullet which killed Tanner. After a hearing on February 2, 1999, Circuit Court Judge John DiMotto denied the motion. On September 28, 2000, the court of appeals reversed that decision and ordered that the circuit court oversee the discovery process so that the electron microscope test procedures could determine who fired the fatal bullet killing Tanner. (Answer, Ex. G.) Chemical testing was done by McCrone Laboratories, however, the results were inconclusive.

On February 28, 2003, McAfee filed an amended petition for new trial. McAfee argued that his trial counsel rendered ineffective assistance of counsel. On January 29, 2004, Circuit Court Judge Michael B. Brennan conducted an evidentiary hearing pursuant to *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). At that hearing, McAfee's trial counsel testified and the circuit court received other evidence and further argument of the parties. The hearing limited the inquiry to three areas of counsel's performance: (1) whether McAfee was shot in the front or back of his leg; (2) counsel's performance with respect to various bullet holes and strike marks on the fences; and (3) the adequacy of counsel's closing arguments. On March 16, 2004, in a decision and order, the circuit court denied McAfee's amended petition for a new trial and held that McAfee's trial counsel did not provide ineffective assistance. (Answer, Ex. D at A-102-127 "*Machner* Decision".) On May 24, 2005, the court of appeals affirmed the circuit court's decision. (Answer, Ex. B.) On August 25, 2005, the Wisconsin Supreme Court denied review. (Answer, Ex. C.)

# APPLICABLE LAW

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") greatly restricts federal habeas review of state court criminal convictions. The United States Supreme Court summarized the narrow scope of federal habeas corpus review of state court judgments as follows:

> AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. *Williams v. Taylor, supra*, at 405, 120 S.Ct. 1495; *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (*per curiam*). A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner. *Williams v. Taylor, supra*, at 405, 120 S.Ct. 1495; *Woodford v. Visciotti*, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (*per curiam*).

*Brown v. Payton*, 544 U.S. 133, 141 (2005).

Thus, "contrary to" and "unreasonable application" have independent meaning. *See Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). The question is whether the state court's application of clearly established federal law is objectively unreasonable; an unreasonable application is different from an incorrect one. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

-6-

> An incorrect application of clearly established federal law is not necessarily an unreasonable one. *Hough v. Anderson*, 272 F.3d 878, 890 (7th Cir. 2001). As such, a federal court cannot substitute its independent judgment as to the correct outcome; rather, it must determine that a state court decision was both incorrect *and* unreasonable before it can issue a writ of habeas corpus. *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000).

*Davis v. Litscher*, 290 F.3d 943, 946 (7th Cir. 2002).

A state court decision "'minimally consistent with the facts and circumstances of the case'" is not unreasonable. *Conner v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004) (citation omitted). A court unreasonably applies federal law if it makes a determination "'lying well outside the boundaries of permissible differences of opinion.'" *Id.* (citation omitted). Finally, a state court's factual determinations are presumed correct and are not "'unreasonable,' unless a petitioner can show otherwise by clear and convincing evidence." *Id.* (and cases cited therein); 28 U.S.C. § 2254(e)(1).

Further, the Court may not grant federal habeas relief unless it determines there was "clearly established Federal law" as determined by the Supreme Court at the time of the state court ruling in question. *Lockyer v. Andrade*, 538 U.S. 63, 71-2 (2003). A rule is "clearly established" when it is compelled by existing Supreme Court precedent. This Court may not rely on precedent of circuit courts of appeals. There must be Supreme Court precedent to support the petitioner's claim and that Supreme Court precedent must have clearly established the relevant legal principle as of the time of the petitioner's direct appeal. *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999).

-7-

# DISCUSSION

McAfee's challenge to his conviction depends on whether he received ineffective assistance of counsel. The Sixth Amendment guarantees criminal defendants the effective assistance of counsel.[2] That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

An ineffective assistance of counsel claim is governed by a two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* is clearly established Federal law, as determined by the Supreme Court of the United States. *See Washington*, 219 F.3d at 627-28. Pursuant to *Strickland*, a petitioner "must show that counsel's performance was deficient . . . [and] . . . the deficient performance prejudiced the defense." 466 U.S. at 687. The first element requires a petitioner to show that his trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* In considering the first element, the Supreme Court has instructed courts not to engage in "the distorting effects of hindsight," and to "evaluate the conduct from counsel's perspective at the time." *Id.* at 689. In addition, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

---

[2]The Sixth Amendment of the United States Constitution provides as follows: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

-8-

Under the second component, a petitioner "must show that there is reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* A petitioner must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial who result is reliable." *Id.* at 687.

If the Court determines that the petitioner has failed to satisfy either component of the *Strickland* test, it need not address the other. *See Chichakly v. United States*, 926 F.2d 624, 630-31 (7th Cir. 1991). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

The court of appeals determined that the performance of McAfee's trial counsel was not deficient and therefore, resolved this case on the performance prong of *Strickland*. (Answer, Ex. B at 5.) The court of appeals stated "we need not address the prejudice portion of the test."[3] (*Id.*) In order to overturn his presumptively valid state court conviction in federal court, McAfee must prove the Wisconsin courts resolved his ineffective assistance

_____

[3]In *Strickland*, the Supreme Court stated that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies" and concluded that where an ineffective assistance claim may be resolved based on lack of sufficient prejudice "that course should be followed." *Strickland*, 466 U.S. at 697. The Court of Appeals for the Seventh Circuit has consistently followed this mandate by first examining whether the petitioner has established prejudice and then, if necessary, examining whether counsel's performance fell outside the parameters of what could objectively be considered professionally competent assistance. *Taylor v. Bradley*, 448 F.3d 942, 949 (7th Cir. 2006). Given the Wisconsin Court of Appeals reliance on the performance prong of *Strickland*, this Court will address the performance prong and the state court's application of *Strickland*.

-9-

challenges in a manner that is contrary to, or involves an unreasonable application of, the principles of *Strickland v. Washington*. *See Bell*, 535 U.S. at 693-94. McAfee must prove the court of appeals' resolution of his *Strickland* challenge was both incorrect and unreasonable. *Id.* at 698-99. On federal habeas review, the state court's findings of fact and credibility determinations underlying its conclusion that counsel was not ineffective are presumed correct and McAfee bears the burden of proving by clear and convincing evidence that they are clearly erroneous. 28 U.S.C. § 2254(e)(1); *Connor*, 375 F.3d at 649. Therefore, the bar for establishing that the state court's application of the *Strickland* standard was "unreasonable," is a high one. *Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). If the state courts took the constitutional standard seriously and produced an answer within the range of defensible positions, the state court decision will be upheld. *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000).

McAfee's first argument for how his trial counsel was ineffective is that counsel's decision to employ the "friendly fire/cover-up" defense seeking acquittal of the charge of first-degree intentional homicide, rather than conceding her client's guilt of reckless homicide, was deficient performance because it was irrationally based on record facts and state homicide law which precluded acquittal. (Petition for Writ of Habeas Corpus by Person in State Custody ("Petition") at 14.) McAfee's first argument is essentially the overarching theme of his Petition. McAfee acknowledges that at trial the uncontroverted and conceded evidence included the following: (1) McAfee knowingly and illegally fled from two City of Milwaukee police officers; (2) causing a backyard neighborhood chase of McAfee by the

-10-

two police officers; (3) during which McAfee fired his weapon toward Tanner, who was chasing McAfee in the dark on foot; and (4) one of McAfee's shots struck Tanner in the lower back, paralyzing him from the waist down, before he died from a different and unidentified gun shot wound to his heart. (Petition at 15.)

McAfee argues that his criminal conduct was a substantial factor and "caused" Tanner's death because this criminal conduct was "practically certain to cause that result." Wis. Stat. § 939.23(4). McAfee argues that under these factual circumstances and the homicide instructions submitted to the jury, it was not a reasonable strategy that McAfee could or would be acquitted of a homicide. Therefore, trial counsel's "clear responsibility at trial was to address 'intent' and to attempt to persuade the jury that her client was guilty 'merely' of first-degree reckless homicide rather than first-degree intentional homicide."[4] (Petition at 16.)

At the *Machner* hearing, McAfee's trial counsel testified. A review of the *Machner* hearing demonstrates that trial counsel was a "seasoned and skillful practitioner of criminal law." (Answer, Ex. B at 8.) She had experience trying first-degree homicide cases and had represented defendants who had been charged with first-degree intentional homicide in

---

[4]First-degree reckless homicide is a lesser included offense of first-degree intentional homicide. First-degree intentional homicide is defined as causing the death of another human being with intent to kill that person or another. Wis. Stat. § 940.01(1). First-degree reckless homicide is defined as recklessly causing the death of another human being under circumstances which show utter disregard for human life. Wis. Stat. § 940.02(1). "With intent to" means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result. Wis. Stat. § 939.23. "Criminal recklessness" means that the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk. Wis. Stat. § 939.24

-11-

which an alternate lesser included charge of reckless homicide had been submitted to the jury. (*Machner* hearing at 5.) After "hundreds of law-firm hours," trial counsel testified that her principal strategy was that "friendly fire" from Ketterhagen caused the death of Tanner because she alleged it was the source of the fatal bullet. (*Id.* at 6.) Trial counsel described her strategy as "friendly fire and cover-up." (*Id.* at 6, 22.) McAfee was consulted and agreed with this trial strategy. (*Id.* at 22, 34.) Trial counsel testified that the prosecution argued that McAfee "ambushed" Tanner by hiding behind some bushes and that McAfee had shot Tanner with both of McAfee's hands on the gun, one hand on top of the other. (*Id.* at 8.) Trial counsel testified that upon reflection she should have used "a more general approach" in which she addressed both friendly fire and reckless homicide. (*Id.* at 16.)

The circuit court judge determined that trial counsel testified "in a manner which appeared to be calculated to aid the defendant" and that "[s]ome of her testimony seemed to be offered with an understanding that it could benefit her former client." (*Machner* Decision at A-104-05.) The circuit court judge further found that "[h]er easy and ready admission of deficient performance or error lessened her credibility as to the reasoning for certain decisions before and at the jury trial in this case." (*Id.* at A-105.) A credibility determination is presumed to be correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C § 2254(e)(1); *United States v. Woods*, 233 F.3d 482, 484 (7th Cir. 2000) ("the trial judge is in the best position to judge the credibility of witnesses . . ..").

McAfee having proceeded on a friendly fire and cover-up defense at trial, with the benefit of hindsight, argues that his trial attorney should have essentially done a better job

-12-

impeaching the "ambush" theory to support the lesser-included offense of first-degree reckless homicide.  The circuit court determined that defense counsel made a strategic choice to argue a theory of friendly fire and cover-up and that her decision to "stick to the agreed-upon theory of defense, rather than admit that the defendant did shoot Officer Tanner after all, was not deficient." (*Machner* Decision at A-112.)  The circuit court commented that the strategic decision to rely on the friendly fire and cover-up defense could have been "undercut to the point of failure" if the defense also developed testimony and argued that McAfee had actually shot Tanner but in a way different from the way argued by the prosecution.  (*Id.* at 113.)  The circuit court noted that although McAfee now asks the court to "second guess" his trial counsel's selection of trial tactics and exercise of professional judgment, trial counsel testified that she considered reckless homicide, made sure a jury instruction addressing reckless homicide was submitted to the jury and believed that reckless homicide and friendly fire were consistent.  (*Id.* at A-112.)  The circuit court determined that a strategic trial decision rationally based on the facts and law will not support a claim of ineffective assistance of counsel.

On appeal, the appellate court, noted that the difference in strategy utilized by trial counsel from that advocated by McAfee on appeal is subtle, but nevertheless significant. (Answer, Ex. B at 9.)  The strategy taken by trial counsel presumed that McAfee was not the shooter, whereas the strategy now advocated by McAfee on appeal presumes that he was. (*Id.* at 17.)  The appellate court noted that the strategy advocated on appeal (which is the same strategy advocated in McAfee's petition) could have potentially diluted the

persuasiveness of the chosen "friendly fire/cover-up" defense by accompanying it with elements of a defense that were inconsistent. (*Id.* at 18). The appellate court determined that trial counsel's performance was not deficient.

In order for McAfee to prevail in his habeas petition, this Court must find that the state courts applied the principles of *Strickland* incorrectly and unreasonably. McAfee fails to establish that the state courts' application of *Strickland* was incorrect or unreasonable. This Court's review of the state court decisions rejecting McAfee's claim of ineffective assistance of counsel, confirms that the state courts set forth the correct standard of review for an ineffective assistance of counsel claim, as enunciated by the United States Supreme Court in *Strickland*. In particular, the circuit court issued a thorough and well-reasoned decision. Although McAfee disputes the conclusions reached by the circuit court judge, McAfee does not demonstrate by clear and convincing evidence that the circuit court's decision is unreasonable or that the circuit court's decision lies "well outside the boundaries of permissible differences of opinion.'" *Connor,* 375 F.3d at 649.

The law is quite clear that strategic choices made among plausible options after a thorough investigation of the facts and applicable law are "virtually unchallengeable." *Strickland*, 466 U.S. at 689. The challenged conduct – trial strategy –  must be evaluated from trial counsel's perspective at the time, taking into account all of the circumstances without the "distorting effects of hindsight." *Id.*   In this case, trial counsel weighed both friendly fire and reckless homicide and believed the theories were consistent, although she testified at the *Machner* hearing that she now believes they are less consistent. (*Machner*

-14-

hearing at 16.) The fact that the friendly fire defense did not result in an acquittal and McAfee now prefers that a different theory would have been emphasized does not constitute deficient performance. There are "countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Trial counsel's strategic choice to pursue a friendly fire/cover-up defense to defend against a charge of first-degree intentional homicide "was well within the range of professionally reasonable judgments." *Id.* at 699. The Court concludes that the state courts did not unreasonably apply federal law when they determined that trial counsel made informed and reasoned decisions regarding trial strategy and that her performance was not deficient.

McAfee's second argument is that trial counsel irrationally abandoned and failed to argue the lesser-included crime of first-degree reckless homicide in her closing argument, which was without her client's consent and was his only reasonable defense as a matter of law. (Petition at 16.) McAfee argues that trial counsel's closing argument "abandoned" the reckless homicide defense and failed to "sharpen and clarify" the relevance of the reckless homicide instruction to the evidence. (*Id.* at 18.)

At the *Machner* hearing, trial counsel stated that she thought she had argued in support of first-degree reckless homicide. (*Machner* hearing at 17.) She testified she had planned to so argue, that such an argument was included in her closing argument outline, and "there is absolutely zero reason why I did not." (*Id.*) Trial counsel testified that "[t]he only thing I can think of is this was a tense case. I was rattled." (*Id.* at 18.) Trial counsel

-15-

admitted that she argued that the defendant's statement to police did not evidence "intent" and that the defendant did not intend to kill Tanner. (*Id.* at 23-24.) She confirmed that "the theme of all the evidence I was trying to get out" was that the killing of Tanner was not intentional. (*Id.* at 24.)

The circuit court held that the trial counsel's closing argument was consonant with the agreed-upon friendly fire/police cover-up theory of defense. The circuit court noted that McAfee's defense was that he did not shoot Tanner, that Ketterhagen did by "friendly fire" and the police covered up this fact, including changing testimony and manufacturing evidence. Consequently, the circuit court held that "the defendant's trial counsel could not have reasonably offered to the jury the 'friendlyfire/cover-up' explanation of events" and argued that McAfee engaged in reckless shooting. (*Machner* Decision at A-117.) The circuit court further explained that the two theories are not alternatives – the first theory argues that McAfee is not the shooter, the second theory presumes that he is. The circuit held that offering the second theory would undercut the agreed-upon pretrial strategy that friendly fire killed Tanner. The circuit court found that trial counsel's testimony that she was "rattled" and forgot to argue the first-degree reckless homicide at closing was offered to aid McAfee at the post-conviction stage and was not credible. The circuit court concluded that given the agreed-upon theory of defense, the development of the evidence during the trial and admissions secured at trial, trial counsel's closing argument was reasonable and did not constitute deficient performance. (*Id.* at A-119.)

-16-

On appeal, the court of appeals emphasized that when the trial judge gave its final instructions to the jury before closing arguments, contained within the instructions were five different instances in which the jury was informed that if it was not convinced beyond a reasonable doubt by the evidence presented that McAfee was guilty of first-degree intentional homicide, then it ought to consider whether he was guilty of first-degree reckless homicide. The lesser included charge of first-degree reckless homicide was requested by McAfee and included in the jury instructions. (Answer, Ex. B. at 15.) McAfee argued that Tanner's death was caused by friendly fire, and therefore, denied any intent to kill Tanner. The court of appeals noted that trial counsel's closing stressed McAfee's lack of intent to kill Tanner. If successful, the jury would then have had to consider the reckless homicide charge. The court of appeals held that the fact that defense counsel was unsuccessful in convincing the jury that McAfee lacked intent was "irrelevant." (*Id.* at 16.) The court of appeals further held that trial counsel's summation consistent with the trial strategy, was not irrational under the facts or the law and was a "coherent whole." (*Id.* at 17.)

The right to effective assistance extends to closing arguments. *Bell v. Cone*, 535 U.S. 685, 701-02 (2002). The Wisconsin Court of Appeals cited to *Yarborough v. Gentry*, 540 U.S. 1 (2003) which is instructive.

> [C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," . . . but which issues to sharpen and how best to clarify them are questions with many reasonable answers. . . . Judicial review of a defense attorney's summation is therefore highly

deferential – and doubly deferential when it is conducted through the lens of federal habeas. . . .

Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. Focusing on a small number of key points may be more persuasive than a shotgun approach. As one expert advises: "The number of issues introduced should definitely be restricted. Research suggests that there is an upper limit to the number of issues or arguments an attorney can present and still have persuasive effect.". . . Another authority says: "The advocate is not required to summarize or comment upon all the facts, opinions, inferences, and law involved in a case. A decision not to address an issue, an opponent's theory, or a particular fact should be based on an analysis of the importance of that subject and the ability of the advocate and opponent to explain persuasively the position to the fact finder." . . . In short, judicious selection of arguments for summation is a core exercise of defense counsel's discretion.

When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. . . . Moreover, even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.

*Id.* at 5-8.

When reviewing a state-court decision, this Court may only issue a writ of habeas corpus if "the state court's application of governing federal law is . . . shown to be not only erroneous, but objectively unreasonable." *Id.* at 5. As previously discussed, this is a difficult standard to meet because "unreasonable" means "something like lying well outside the boundaries of permissible differences of opinion." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoted source omitted). In this case, as requested by defense counsel, the jury was instructed on the lesser-included offense of first-degree reckless homicide. (Answer, Ex. 66 at 79, 113-15.) The jury was also instructed on the theory of defense that McAfee did not intend to kill Tanner and if the jury determined that McAfee did not intend to kill Tanner,

-18-

then the jury was instructed to find McAfee not guilty of first-degree intentional homicide. (*Id.* at 117, 80-84.)

This Court's review of trial counsel's closing statement must be "highly deferential." *Yarborough*, 540 U.S. at 6. During her closing, trial counsel emphasized the change in Spingola's testimony as to the direction of bullet holes and markings on the fence. This change in testimony took place over a lunch break during trial which trial counsel contended supported a "cover-up" theory. (Answer, Ex. 66 at 169-70.) Trial counsel also conceded that McAfee had shot at Tanner – "[w]e're not questioning that he fired [at Tanner]" (*Id.* at 172.) Trial counsel stated that her client was "innocent" then argued that "I don't think Officer Ketterhagen intended to kill his partner. I don't think Antonio McAfee intended to kill Wendolyn Tanner." (*Id.* at 172, 174.) Trial counsel argued that the physical evidence of the bullet strike markers and stockade fence did not support McAfee intentionally killing Tanner. (*Id.* at 178.) Trial counsel contended that McAfee "as a matter of law was not guilty." (*Id.*)

Thus, trial counsel argued that McAfee shot at Tanner but under circumstances and for reasons other than with the intent to kill. Trial counsel's closing argument was consistent with both the specific "friendly fire/cover-up" defense as well as the defense that McAfee shot at Tanner without the intent to kill him. Trial counsel's focus was on acquitting McAfee of intending to killer Tanner. This focus was reasonable given the trial strategy of "friendly fire/cover-up." If the jury agreed with trial counsel's argument that McAfee did not intend to kill Tanner, it could have acquitted McAfee of first-degree intentional homicide or it could have returned a verdict of guilty of reckless homicide. The jury, however, found

-19-

McAfee guilty of first-degree intentional homicide. Trial counsel's closing statement was not deficient. While McAfee now disagrees with trial counsel's strategy and offers arguments that he thinks should have been emphasized, this is done with the great benefit of hindsight and is not the lens through which this Court will view trial counsel's advocacy. The determination by the state courts that trial counsel's closing argument was not deficient was a reasonable application of *Strickland.*

McAfee's third argument is that trial counsel failed to introduce medical evidence documenting the location of the wound to McAfee's leg. This medical evidence, obtained by McAfee's post-conviction counsel following McAfee's conviction, established that McAfee was shot on the front of his right leg below the knee. McAfee argues that this evidence impeached the prosecution's ambush theory. McAfee contends that this evidence would have impacted Ketterhagen's testimony (a) that he did not shoot at McAfee until after McAfee was running from the shoot-out; (b) that McAfee was not facing Ketterhagen during the shootout; (c) that Ketterhagen did not shoot at McAfee before he ran, so that McAfee was never significantly close to Tanner while Ketterhagen fired; and (d) that Tanner was ambushed without seeing McAfee and without firing his weapon at McAfee because Tanner may have administered, as the circuit court posited, the shot and wound to McAfee as Tanner charged toward and through the stockade fence. (Petition at 19.)

At the *Machner* hearing, trial counsel testified that this evidence "dramatically supported a presentation of first-degree reckless homicide," and that this evidence would have tended to defeat the ambush theory and that she "missed [this evidence] completely."

(*Machner* hearing at 20.)  The circuit court judge discussed that at the trial, the district attorney argued that the location of the wound on McAfee's leg may support the state's case. McAfee's trial counsel objected and moved for mistrial.  The district attorney realized that there was no medical evidence for where the defendant was shot in the leg.  Consequently, he drafted and requested that the jury be instructed not to consider in any way any arguments of counsel concerning any alleged injury to McAfee's leg.  McAfee's trial counsel did not object to this instruction and it was read to the jury by the trial judge.  The circuit court judge determined that trial counsel was cognizant of the weight of such potential evidence and made a strategic choice as to its use, here, stipulating to the exclusion of any argument based on the location of the wound.  The circuit court held that trial counsel's performance was not deficient.  (*Machner* Decision at A-108-09.)

The circuit court also held that even if the trial counsel's performance was deficient by not discovering the medical record that demonstrated that McAfee was wounded on the front of his leg and offering this evidence at trial, McAfee did not prove that this alleged deficiency prejudiced him.  As noted by the circuit court judge, the evidence did not establish whether Tanner or Ketterhagen shot McAfee in the leg.  The circuit court judge speculated that Tanner may have shot McAfee as Tanner came through the opening in the stockade fence.  This scenario would not be necessarily inconsistent with the prosecution's ambush theory.  Another plausible scenario was the Officer Ketterhagen may have shot the defendant on the front of his leg when the defendant was running north, away from the shooting, if the defendant turned around at any point and then received the wound.   The circuit court judge

determined that the location of the wound was not exculpatory evidence and therefore McAfee was not prejudiced by trial counsel's alleged failure to discover the evidence, seek its admission and argue inferences from it. (*Id.* at A-120-21.)  The court of appeals noted that McAfee failed to adequately explain how an anterior wound to his leg would defeat the ambush theory and thus, make a difference in the outcome of the case. (Answer, Ex. B at 12.)

As previously discussed, in order to prevail, McAfee must demonstrate that the state courts' resolution of his *Strickland* challenge was both incorrect and unreasonable.  McAfee has not met his burden.  It is not disputed that McAfee was shot by Ketterhagen or Tanner.  It is reasonable to posit that Tanner shot McAfee as Tanner emerged through the fence and McAfee was in an "ambush" position or that Ketterhagen shot McAfee as McAfee fled and McAfee turned to see where the shots were coming from and was wounded.  These theories demonstrate that even if the medical evidence had been submitted, the medical evidence could not have been used to necessarily undermine the prosecution's case.  This medical evidence does not exonerate McAfee of first-degree intentional homicide or clearly convict him of first-degree reckless homicide.  McAfee's argument to the contrary is purely speculative.  McAfee has not demonstrated that the state courts applied *Strickland* incorrrectly or unreasonably by determining that trial counsel's performance was neither deficient nor prejudicial.  McAfee fails to demonstrate that there is a reasonable probability that but for counsel's alleged professional error in failing to secure this evidence, the result of his trial would have been different.

McAfee's fourth argument is that trial counsel failed to develop evidence and argue that the strike marks on both the stockade and split rail fences impeached the ambush theory and corroborated the defense of first-degree reckless homicide. (Petition at 19.) McAfee contends that trial counsel unreasonably failed to effectively cross-examine the investigating police officers as well as the state's forensic firearms expert. At trial, the prosecution argued that McAfee hid behind the fence and ambushed Tanner. The trial evidence included testimony describing one or more "strikes" on the stockade fence in a north to south direction. McAfee contends that this evidence was inconsistent with the ambush theory because it indicated that the shooter was at some relevant location north of the opening through the stockade fence when the shots were fired. McAfee further argues that the strike marks support McAfee's statement to police that he was shooting blinding over his left shoulder either while jumping through the fence opening or over his shoulder as he ran north along the fence. (Petition at 20.)

At the *Machner* hearing, trial counsel testified that during the trial, Detective Spingola ("Spingola"), a firearms expert, testified regarding bullet strikes on the stockade fence, the fence that had the hole in it that McAfee and Tanner jumped through. Spingola testified that in the morning that the bullet strikes were from south-to-north, which was consistent with a "friendly-fire/cover-up" defense. After lunch, Spingola changed his testimony and testified that the bullet strikes on the fence indicated they were fired in a north-to-south direction. (*Machner* hearing at 14-5.)

The circuit court in its decision discussed that trial counsel impeached the investigating police officer regarding his contradictory testimony with respect to the direction of the bullets that struck the stockade fence. The circuit court emphasized that witnesses were cross-examined in support of a "friendly fire/police cover-up" theory. Similarly, the appellate court stated as follows:

> She questioned Detective Springola in depth about the inconsistencies in his testimony; i.e., his morning testimony wherein he stated that the direction of the bullet marks in the stockade fence were consistent with Officer Ketterhagen's firing from a southerly direction; whereas in the afternoon, he changed his testimony and stated that the direction of the bullets causing the marks was from north to south. This cross-examination lent further persuasive weight to the "cover-up" theory of the defense. She further questioned Detective Springola about the bullet hole in the fencepost of the split-rail fence located eighteen inches from the ground and the spent shell casing laying not far from where Officer Tanner was found. This factor provided support for the "friendly-fire" version of events.

(Answer, Ex. B. at 13-14.)

The court of appeals discussed this cross-examination as well as the cross-examination of the state's firearms expert in the context of a friendly fire/cover-up strategy and determined there was a reasonable basis in the record for this strategy. (*Id*. at 14.) During her closing argument, trial counsel argued the paucity of evidence to support an "ambush theory" and the inadequate response to her strategic theory of friendly fire and cover-up. McAfee again fails to establish that the state courts' application of the principles of *Strickland* was unreasonable or incorrect. Decisions by counsel which fall "squarely within the realm of strategic choice" will not support a *Strickland* challenge. *United States v. Ciesolwski*, 410 F.3d 353, 361 (7th Cir. 2005).

-24-

McAfee's fifth and final challenge to his trial counsel's performance is that counsel's cross-examination of Ketterhagen "failed to adequately address the gross inconsistencies between the physical evidence and his ambush testimony, which would have impacted the prosecution's 'ambush' theory relative to the issue of intent." (Petition at 20.) McAfee contends that effective cross-examination of Ketterhagen would have impeached the "ambush" theory and supported the argument that McAfee may have shot recklessly while running away but was not waiting to "ambush" and intentionally kill Tanner.

The court of appeals determined that with the benefit of hindsight, McAfee's preferred lines of questioning might have been more productive in achieving a reckless homicide verdict, however, "[s]uch a level of performance is not the test. (Answer, Ex. B. at 7.) The court appeals concluded that trial counsel's cross-examination based on a friendly fire/cover-up defense was rationally based and objectively reasonable. (*Id.* at 9.) The conclusion of the appellate court is not incorrect or objectively unreasonable. This Court must avoid determinations of deficiency constructed with the benefit of hindsight.

McAfee cannot overcome the strong presumption that trial counsel made sound strategic decisions and performed in a reasonably competent manner. Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after the sentence has been imposed. When a defendant's trial counsel "chooses a professionally competent strategy that secures for the accused the benefit of an adversarial trial," the Constitution is satisfied. *Kokoraleis v. Gilmore*, 131 F.3d 692, 696 (7th Cir. 1997). Trial counsel's advice and performance was well within the wide

-25-

range of reasonable professional assistance and does not constitute deficient performance. The Sixth Amendment does not entitle a criminal defendant to the best available counsel or the most prudent strategies. The Constitution calls for a professionally competent defense, not for the best possible defense. *Holman v. Gilmore*, 126 F.3d 876, 883 (7th Cir. 1997); *Strickland*, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). McAfee fails to establish that the Wisconsin courts acted contrary to, or unreasonably applied, the principles of *Strickland v. Washington*, when McAfee's claim of ineffective assistance of counsel was rejected.

Moreover, after reviewing the record, this Court determines that McAfee does not prove prejudice. In statements read to the jury, McAfee admitted that he knew he was being chased by a police officer. (Answer, Ex. 65 at 108.) McAfee fled from the police officer because he knew he was in violation of his parole by carrying a loaded gun. (*Id.*) At one point, McAfee dropped the gun and stopped to retrieve it. (*Id.*) McAfee stated that he was running west and was heading toward a fence when he heard bushes rustling, "saw a blur, and then pointed the gun behind him toward the bushes" and "fired at the blur three times." (*Id.* at 108-09.) McAfee stated he "fired at the police officer to slow him down, to scare him, and to make him stop chasing him so he, McAfee, could get away." (*Id.* at 109.)

McAfee fired seven shots from a .357 Smith & Wesson revolver at Tanner. One of the bullets fired by McAfee entered Tanner's lower back, partially severed his spine, ricocheted through his chest and lodged at his right clavicle. This shot was described as

-26-

"potentially fatal."  Ketterhagen was the only eyewitness to the shooting.  Ketterhagen testified that he saw McAfee emerge through a hole in a fence into the alley, move several steps southwest of that hole, "hide[] himself around the corner," and then fire several rounds at Tanner as Tanner emerged through the same hole in the fence.  (Answer, Ex. 59 at 35-38; Ex. 61 at 18, 20, 44; Ex. 65 at 32-33, 38-39, 49, 59, 176-79.)

Ketterhagen testified that he after he observed Tanner fall to the ground, he fired off as many as eight rounds from his position approximately 126 feet south of Tanner at McAfee, who fled the scene.  Investigating officers recovered eight shell casings around the very location where Ketterhagen testified that he opened fire in the direction of McAfee.  (Answer, Ex. 59 at 40-1; Ex. 64 at 4-5; Ex. 65 at 180-85.)  The medical examiner testified that the shot to the right armpit, which was certainly fatal, could not have been fired by someone in Ketterhagen's position approximately 126 feet to the south of Tanner if Tanner had fallen to the ground.  (Answer, Ex. 65 at 46-47, 50.)  Forensic evidence established the "possibility" that McAfee fired the gun with both hands, holding one hand over the other, presumably to steady the gun when he fired at Tanner.  (Answer, Ex. 64 at 45-46.)  Given these problematic facts for the defense, defense counsel attacked the credibility of Ketterhagen's eyewitness account as well as other inconsistencies in testimony offered by police investigators.  The jury was instructed on the lesser included offense of first-degree reckless homicide but unanimously convicted McAfee of first-degree intentional homicide.

-27-

In a habeas action, only those "who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). McAfee is unable to demonstrate that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. McAfee is unable to demonstrate that he was deprived of a fair trial whose result is reliable. *Id.* at 687. In this case, the testimony of Ketterhagen, the medical examiner, McAfee's admitted statements and other corroborating evidence strongly supported McAfee's conviction of first-degree intentional homicide.

In conclusion, the decisions of the state courts were neither contrary to nor involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Further, the state courts' adjudication of McAfee's claims did not result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented. Therefore, McAfee's petition for writ of habeas corpus is denied.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that McAfee's Petition for Writ of Habeas Corpus (Docket No. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

**IT IS ALSO ORDERED** that the Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 3rd day of November, 2008.

SO ORDERED,


*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**Chief Judge**